Good morning, counsel, your honors. This is an egregious case. Could I ask you please to speak directly to the microphone? I'm having trouble hearing you. Okay. And are we talking about the 1980 case, 79 case, or 78 case first? We're talking about that 1981 case first. 1981 case. Yes. The one out of Marion County. Yes, the Marion County. This is the one where the motion for a change of venue had been granted. It was granted. Okay. Yes. Okay. Okay. In an egregious case of ineffective assistance of counsel, Mr. Schroeder's trial attorney failed to conduct an independent investigation, and this resulted in the defense introducing the most damaging evidence against Mr. Schroeder, the testimony of Mr. May and Ms. Shannon May, who identified Schroeder as the same person who broke into their home and sexually assaulted Ms. Shannon May in a crime that was nearly identical to the charge conduct in this case. This was highly prejudicial because the evidence for the charged victims was weak. Those victims were unable to identify their assailants. This was also prejudicial for another two reasons. One, the May prosecution's otherwise weak identification evidence, and two, the defense introduced more prior bad act evidence that the jurors otherwise would not have heard of, and in particular, this Shannon May crime has cheese bite mark evidence that linked. You know, we can now look back at what happened at the trial, of course, and we can see how things played out at the trial, but at the time when counsel made that decision to call the Mays, what was his strategy? It appears that counsel was not prepared for trial. The day scheduled for trial, he stated that he thought he had a handle on the prosecution's evidence, but he never said that he conducted his own independent. So what he thought he knew was he had been told by John Halpern, the prior attorney, that Dr. Alexander, the cheese, one of the two cheese bite mark evidence experts, had previously told him that Mr. Huntington was actually the bite mark for the Shannon May incident, and they also had an officer named Whitely, I think it was, who said the same thing. However, by the time trial started, everyone knew that Dr. Alexander had changed his position on that and said that it was Schroeder's bite mark, and there was a second expert for the prosecution who also said that it was Schroeder's bite mark, not Huntington's. Had the defense counsel just interviewed the Mays, he would have found out that they knew Mr. Huntington because he lived in the apartment building, and they would have definitively said he's not the one, which would totally undermine what the defense's argument was for this case, and he would have never called them, and this other cheese bite mark evidence wouldn't have come in to also link Mr. Schroeder to the second, I'm sorry, the first crime, the charged conduct. When the Mays actually were called to testify, was their testimony a complete surprise? It appears it was. There was an in-chambers brief meeting right after they testified where the defense counsel expressed surprise with their testimony, accused the prosecution of a Brady violation because it appeared that Mr. May had actually told the prosecution that Mr. Huntington was not the one and that he recognized Mr. Schroeder as looking into the Mays' home, their back window, two to three weeks before Ms. Shannon May was actually sexually assaulted. So he was totally surprised. It's true that the trial court did give a curative instruction by telling the jury they're not to regard the identification of him as the one who looked through the window, but it didn't cure the fact that Ms. Shannon May identified him as the person who sexually assaulted her, and then the prosecution used that evidence to prove that he also committed this. The prosecution said something along the lines of these crimes were identical. If he committed one, he committed them all. Had they not had this evidence, they would have had the Ware, Creighton, Weimer prior bad act evidence only, which did not have the cheese bite mark evidence. It's still pretty compelling evidence by the others, correct? That is true. However... How is this particular decision by counsel, how does that result in prejudice to him? Well... Because even if we were to agree with you that he should have, counsel should have done X, Y, and Z, and it was ineffectiveness, you still have to establish prejudice. Well, there were some... And there was quite a bit of evidence in this one. This was a pre-DNA case. In terms of identification, because that was the key aspect of the linking evidence, they used Weimer, Creighton, and Ware. And Weimer, while she claimed at trial that the mask had fallen off and she actually could see the man's face, she never told the police that. So that makes her testimony a little bit questionable. And then Ware, similarly, initially told the police, I cannot provide much And I only saw the guy for a few seconds. But by the time it came to trial, he was positive about his identification. And remember, this is also a case where there was a pre-trial publicity right for the trial, which caused the change of venue. And all of these individuals live in the Eugene neighborhood where Mr. Schroeder's photo on the front page was nearly the size of this binder. So they were all contaminated a bit with their identifications, because they had seen that. Unfortunately, it's true that trial counsel failed to inquire into those, which is yet another example of his ineffectiveness. Now, of course, the state court dealt with all of these issues. And it was generally believed by everybody that whoever committed one of And I suspect that counsel's strategy was, let's get the state off on all of these cases. And if we can find any weakness in any one of them, it goes to the one that is being tried. That's not a bad strategy. Now, you're suggesting that he should have attacked these victims and the witness, the gentleman who was also a witness. Am I right? Do I have the right case in mind? Yes. I wouldn't use the word attack, however. But he pointed out the disparity between the testimony of the various witnesses instead of attacking the individual victims, if you will. Now, that might have been a losing strategy ultimately. But it's understandable, as opposed to attacking these victims for whom everybody would have a degree of sympathy. And this is where the cumulative error argument comes into play, is that because the trial court also denied the eyewitness identity expert who could have testified about the fallacies of common sense with regard to Ware, Creighton, and Weimer's testimony, that would have provided scientific evidence to show that they, I'm sorry, let me rephrase that, that their testimony should be viewed with caution because of the passage of time. More than a year had occurred from the time of the incidents to trial. Dr. Hawkins had also been able to testify that the degree of certainty that the witnesses, I'm 100% positive, that is not whatsoever correlated to accuracy of identification. And the more that someone is involved in a traumatic incident, the less likely it is that they'll accurately remember anything. And then there's the unconscious transference, whereby if you see someone's face in another location, we as human beings are fallible. We have a tendency to not accurately recall why, which would explain why Ware, Creighton, Weimer all originally told the police they couldn't identify the man. But after that newspaper article came out, they all, by the time trial came out, they all identified him as the person. On the issue of the denial of funding for expert witness testimony, don't you have to show under 2254 D1 that there's established Supreme Court precedent for that requirement? Yes, we do. And did you? We believe we did. What case says that eyewitness testimony funds has to be given? I understand that there's some cases saying that psychiatric examination funds have to be given. But eyewitness cases? It's our position that it's the general principle about the right to present the defense. At what level of generality do we have the Supreme Court acting? I'm sorry, Your Honor. Is this simply a question, well, due process requires funds for adequate defense? It's about the meaningful right to access to justice as, well, Aiki was decided a few years later, it talked about how the Supreme Court was being called upon to clarify because somehow the lower courts weren't understanding that access to justice meant that the defense should have the same tools in their toolbox as the prosecution. But you don't have any case that you can point to that's clearly established that says the Supreme Court's element of due process is a provision of funds for eyewitness testimony? That's correct, Your Honor. Okay. Why don't we hear from counsel on this case, and then I'll give you a minute to respond. Then we'll take up the other two. May it please the Court, Susan York on behalf of the State, we ask that the Court affirm. In this case, petitioner raises several claims of ineffective assistance of trial counsel and one standalone claim of error related to the denial of funds for an expert witness. I'll turn first to the ineffective assistance of counsel claims. Petitioner is not entitled to relief on those claims because he failed to establish that the State Court's decision was unreasonable. It's important that this Court evaluate counsel's performance without the evidence that counsel found himself in at the time. And counsel's position was this. The State's case against petitioner was very strong, and counsel needed to find some way to try to inject reasonable doubt into the case. Calling the Mays as witnesses was reasonable as a way to introduce evidence suggesting that a different person, Howard Huntington, had committed the charged crimes. And it would have been reasonable, even if counsel could somehow have been able to learn, which it's not clear that he could have been, ahead of time that the Mays would claim that Huntington was not their attacker. That's so because only by calling the Mays could counsel link cheese bite marks in the victim's house with cheese bite marks in the Mays' home and introduce evidence showing that Huntington was responsible for both those bite marks and both those assaults. And she just, and counsel just argued that prior to the trial that it was well known that the expert had changed his position. Is that documented in the record? In the record, it does appear that trial counsel was aware that Dr. Alexander had changed his position. Before trial. Before trial. Or at least by the time of trial. But counsel called the Mays knowing that Huntington had already changed his position, the State's case had already been put on. And this was a way of showing, it was a way of discrediting Dr. Alexander to some extent or suggesting that at some point, Dr. Alexander had said both that the Swiss cheese, which was found in the Mays' home and the cheddar cheese found in the charged crimes, that the bite marks belong to Huntington. And that at least creates confusion. It introduces Huntington as this other character that potentially committed the crimes. And it's a way of introducing reasonable doubt into the case. Did defense counsel ever ask the Mays whether they knew Huntington and thought that he was the culprit before he put them on the stand? He did not ask them before he put them on the stand. He talked to Mr. May briefly before trial. And he had known that Huntington was a person of interest in the case based on the Mays' reporting and that Huntington lived in the building. And that's why... Are you saying to me that the Mays pointed the finger at Huntington any time before trial? They certainly caused Huntington to be a person of interest based on the police reports. Mr. May identified Huntington's boots as similar to the boots that the assailant wore. He said that they were newer than the boots that the assailant wore, but very similar. And it was based on that information that police investigated. Did defense counsel ever say, do you think Huntington was a rapist? No. But he did not do so on direct either. So counsel was quite prepared. He got from the Mays exactly what he wanted to get from them on direct examination. And what he wanted to get from them was the similarities in the charged crimes between the charged crime and the crime that the Mays suffered. All of these similarities. And then he got from the Mays on direct exactly what he wanted, which was that they were certain that the person who had bit the cheese was the person who assaulted them. And then he planned to introduce the evidence about Huntington through Officer Whitney and through Mr. Halpern, which he did. And from counsel's position, it didn't really matter if the Mays, it's sort of two points. One, he had no reason to anticipate that the Mays would definitively say that Huntington was not their attacker, given that police had investigated Huntington based on the Mays reports. So if the Mays knew Huntington and knew he wasn't their attacker, it's not clear why the police would have gone on to get tooth casts of Mr. Huntington and to investigate him extensively. So counsel had a very good reason for thinking that the Mays would not definitively say Huntington is not my attacker. And second, even if they were going to say that he's counsel may very well reasonably have still put them on the stand because this was sort of the only way to get this Huntington evidence in and to inject reasonable doubt into the case to attempt to do so. Well, now, even the prosecutor referred to this witness, the so-called expert on the bite evidence, as confused. Now, there was confusion about his opinion in the charge crime, was there not? Yes. And that was pretty apparent to counsel before he tried to interject confusion in another case, right? Yes. If I understand your question. And the confusion in the other case would only fortify the evidence that there was confusion in the mind of that expert witness in the case on trial. Correct. It didn't add anything very much to the confusion that everybody acknowledges this witness suffered, right? I think that's correct, but it definitely throws in some confusion about who the bite marks belong to. And this lawyer put these witnesses on the stand without realizing that cross-examination was going to be rather devastating, right? So a couple points on that. I think that's correct. I don't think counsel anticipated the extent and the exact content of cross, but I also don't think that cross was devastating. Miss Shannon May actually did not identify Schroeder as her assailant. All she said was that he was similar in height and weight. And counsel's position going into this, calling the Mays, he was already in a bad position. We have the other crimes evidence from the Ware, those witnesses and victims specifically, strongly identified Mr. Schroeder as their assailant. And the similarity between that Ware crime and the charge crimes were very strong similarity. So counsel was already in a really bad position and the Mays could only help him by introducing reasonable doubt regarding Huntington. Or if cross-examination suggested that possibly Schroeder was responsible for this crime as well, then he was essentially returned to the position that he was in after the Wade's case. But he had access to this witness, the man. Mr. May. Yes. Before trial and had a chance to go into some depth as far as questioning. There was no, he was, he, as a matter of fact, had conversation with him. He had one brief conversation with Mr. May before trial and Mr. May was not particularly cooperative. And so on that point, I would say it goes to prejudice. Petitioner hasn't shown that had counsel reached out to Mr. May sooner or tried to interview these witnesses more extensively, that they would have cooperated, that they would have told him help from helpful information, that that information would have then caused counsel not to call the Mays and that the decision not to call the Mays had a reasonable probability of affecting the verdict. That's what petitioner must show to establish prejudice. And he hasn't shown any one of those things. Do you recall which one of the two witnesses was called first by the defense? Ms. Shannon May. Shannon May, the woman. Okay. Yes. And she had, she had testified that it was the accused who committed the crime against her. She testified that he looked similar in height and weight. She could not positively identify him. Okay. And what did the man add to her testimony other than the fact that he could positively identify this guy because he had seen him before and so on? So Mr. May did not identify petitioner as the assailant either. He identified him as the person who had looked in his door two to three weeks before trial. And the trial court in fact excluded that testimony and told the jury not to consider it. Oh, okay. That was, the jury was instructed to disregard that? Correct. That testimony. That's correct. All right. Anything else? I do have one quick point on the ineffective assistance of counsel claim with respect to impeachment of the victims. In her reply brief, counsel suggests that perhaps defense counsel could have introduced the prior inconsistent statements of those victims without cross-examining about them. And I would just point the court to ORS 45.610, which was the statute in effect at the time of this trial and required all witnesses to be confronted with any prior statements and questioned about them before any extrinsic evidence of those statements could be admitted. Okay. Thank you. Counsel, I'll give you just a minute to respond to this on this ineffective assistance issue, and then we'll switch to the other two cases. Okay. So one key piece of evidence that we haven't talked about is the fact that the Shannon Mays had a blender stolen. Yes. And Mr. Schroeder was found in possession of that blender, which definitively linked him to the Shannon May crime. The other aspect that counsel has implied . . . The point that counsel didn't know about that blender? That's correct. It does not appear that counsel was aware of that either. All of this is about counsel failed to do his job. Everyone knows that a defense attorney has to conduct an independent investigation and not just merely rely on the police reports. There's no evidence that he attempted to interview any of them. This conversation that he had with Mr. May did not take place before trial. It happened during trial right before Mr. May testified, and Mr. May gave some red flags that his testimony was going to be harmful for Mr. Schroeder. He said things about how, I don't want to say anything except in the courtroom. As a defense attorney, that is a huge red flag that this witness isn't going to help you. We, as defense attorneys, don't have to bring any evidence. It's the prosecution's duty. The defense brought harmful evidence because they didn't talk to the people. If, say, the Mays refused to talk to them, then the defense would know, I don't want to risk something bad happening. I would rather try and eliminate the cheese evidence entirely as junk science and as contamination problems, as is briefed before, because without the cheese evidence, there wasn't forensic evidence linking Mr. Schroeder to the charged victims. So what the defense attorney did, his failures just kept on compounding themselves because they got the blender evidence in, the cheese bite mark, the link. Wasn't there some blood test evidence? There was some blood test evidence, but it was not dispositive. I may be getting my three trials confused on that, so whatever we said in the briefs would be more accurate with that part. Okay. All right. Anything else on this ineffective assistance of counsel claim in this case? No, Your Honor. Okay. So let's switch gears and we'll take up the other two, which are the issues are, except to some factual differences, the legal issues are essentially the same. That's correct. Okay. That's 1535966 and 1535965. Would you like me to talk about both of them together? Yes. Okay. Yes. You've got 20 minutes. Okay.
judges: Leavy, Paez, Bea